Martin A. Muckleroy (Nevada Bar ID No. 9634)
**COOKSEY, TOOLEN GAGE,**
    **DUFFY & WOOG, P.C.**
3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone: (702) 949-3100
Facsimile: (702) 944-3104
mmuckleroy@cookseylaw.com

*Counsel for Plaintiff*

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT JOHNSON, derivatively on behalf of ShengdaTech, Inc.,<br><br>         Plaintiff,<br><br>   v.<br><br>XIANGZHI CHEN, ANHUI GUO, ANDREW WEIWEN CHEN, DONGQUAN ZHANG, A. CARL MUDD, AND SHELDON SAIDMAN,<br><br>         Defendants,<br><br>   and<br><br>SHENGDATECH, INC.,<br><br>         Nominal Defendant. | Case No. 2:11-CV- 01250 |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### JURY DEMAND

Plaintiff Robert Johnson ("Plaintiff"), by and through his undersigned attorneys, upon knowledge as to himself and knowledge and belief as to all other matters, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

### JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and the defendants named herein are citizens of different states and the matter in controversy exceeds

1   the jurisdictional amount of $75,000, exclusive of interest and costs.  In addition, this Court has

2   supplemental jurisdiction under 28 U.S.C. § 1367(a).  This action is not a collusive action

3   designed to confer jurisdiction on a court of the United States that it would not otherwise have.

4         2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3) because nominal

5   defendant ShengdaTech, Inc. ("ShengdaTech" or the "Company") is a Nevada corporation and is

6   subject to personal jurisdiction in this District.

7
### NATURE OF THE ACTION

8         3.     This is a shareholder derivative action brought for the benefit of ShengdaTech

9   against certain of the Company's current and former executive officers and members of the

10   ShengdaTech Board of Directors (the "Board") seeking to remedy, among other things, the

11   Individual Defendants' (defined herein) breaches of their fiduciary duties for knowingly failing to

12   implement and maintain adequate internal controls over the Company's and its subsidiaries'

13   financial reporting, knowingly causing or allowing the Company to make numerous

14   misrepresentations to the investing public, and deliberately failing to properly conduct, or

15   intentionally impeding, an internal investigation into serious accounting discrepancies identified

16   by the Company's auditor, as well as the Individual Defendants' related waste of corporate assets.

17   The fiduciary breaches described herein have resulted in the "de-listing" of the Company's stock

18   by the NASDAQ stock exchange and have exposed the Company to significant costs and

19   liabilities associated with:  (1) an investigation by, and other proceedings before, the Listing

20   Qualifications Department of the NASDAQ stock exchange; and (2) an "investigation" by a

21   "Special Committee" of the Board.  Moreover, the Individual Defendants' actions also have

22   harmed the Company's reputation and goodwill, which may never recover absent sweeping and

23   substantial changes in the Company's governance.

24         4.     The Company now known as ShengdaTech was formed by a "reverse merger" with

25   a United States shell company, Zeolite Exploration Company ("Zeolite"), on or around March 31,

26   2006.  According to the Company's public filings, until the reverse merger took place, Zeolite did

27   not conduct any material operations since its creation in May 2001.  Through the reverse merger,

28

Zeolite acquired all of the issued and outstanding capital stock of Faith Bloom Limited, a British Virgin Islands Company founded by Defendant Xiangzhi Chen ("X. Chen") in or around November 2005 for the purpose of acquiring certain companies engaged in the production of nano-precipitated calcium carbonate ("NPCC") products in China. Effective January 3, 2007, Zeolite changed its name to ShengdaTech.

5.    In recent months, many China-based companies which accessed United States capital markets through similar reverse mergers have come under scrutiny by the United States Securities and Exchange Commission ("SEC"), the securities exchanges on which they are listed, and the general investing public because of accounting issues and fraudulent representations concerning the companies' financial performance and liquidity. Through the reverse merger process, companies are able to sell their shares publically without undergoing the due diligence typically performed by underwriters in advance of an initial public offering and without significant vetting by investors. Noting these issues with the reverse merger process, SEC Commissioner Luis Aguilar recently commented that the SEC has noticed "increasing problems" with Chinese companies formed through reverse mergers. Commissioner Aguilar further observed that "[w]hile the vast majority of these Chinese companies may be legitimate businesses, a growing number of them are proving to have significant accounting deficiencies or being vessels of outright fraud." *See* H. Greenberg, "SEC Goes After Chinese Reverse Mergers," April 6, 2011, available                        at                        *http://www.cnbc.com/id/42451764/ Greenberg_SEC_Goes_After_Chinese_Reverse_Mergers*.

6.    As of July 8, 2011, there have been more than 40 China-based companies that have stopped trading, been subject to securities fraud allegations by the SEC or private investors, and/or had auditors resign citing a lack of confidence in statements by company management. *See* M. Goldberger and L. Krabill, "Fraud Prevalent in Reverse Merger Companies with Operations in China," July 8, 2011, available at http://www.boardmember.com/Print.aspx?id=6424.

7.    Due to the actions of certain ShengdaTech directors and officers, the Company now finds itself among the ranks of other Chinese companies who have been misleading the

1   public. To that end, on March 15, 2011, the Company issued a press release disclosing that its

2   independent auditor, KPMG, identified certain "serious discrepancies" and other "unexplained

3   issues" during its audit of the Company's fiscal year 2010 financial records. That same press

4   release disclosed the formation of a "Special Committee" of the Board, consisting of the Board's

5   three outside directors – defendants Dongquan Zhang ("Zhang"), A. Carl Mudd ("Mudd"), and

6   Sheldon Saidman ("Saidman") – to investigate the "potentially serious discrepancies and

7   unexplained issues relating to the Company and its subsidiaries' financial records identified by the

8   Company's auditors."

9        8.     As later disclosed, the discrepancies and unexplained issues KPMG identified

10  specifically related to: (1) the Company's bank balances; (2) transactions with major suppliers;

11  (3) value added tax ("VAT") invoices and payments; (4) sales and payments for sales by third

12  parties; (5) sales to the Company's second largest customer; (6) discrepancies between KPMG's

13  direct calls to customers and confirmations returned by mail; and (7) concerns raised by directly

14  confirming customer sales and accounts receivables.

15       9.     Purportedly due to the accounting discrepancies and the Special Committee's

16  "investigation," the Company could not file its SEC Form 10-K on time. Resultantly, in

17  accordance with NASDAQ's listing rules, NASDAQ halted trading of the Company's stock on

18  March 15, 2011. NASDAQ subsequently requested that the Company submit a plan to regain

19  compliance with the NASDAQ listing rules and further requested the production of documents

20  and information from the Company.

21       10.    Unfortunately, the Special Committee – comprised of the same three individuals

22  who serve as the Board's Audit Committee – compounded their failure to initially implement,

23  monitor, or otherwise maintain adequate controls over the Company's financial reporting by

24  deliberately failing to conduct an appropriate investigation into the issues raised by KPMG and by

25  deliberately failing to respond appropriately to NASDAQ's requests and demands. Indeed, on

26  April 19, 2011, KPMG informed the Board through a Section 10A letter that "in the view of

27  KPMG, *senior management of the Company has not taken, and the board of directors has not*

28

1    *caused senior management to take*, timely and appropriate remedial actions with respect to the

2    discrepancies and/or issues relating to the Company's financial records that were identified during

3    the course of the audit." (emphasis added). KPMG subsequently resigned as the Company's

4    auditor on April 29, 2011.

5         11.    Further, on April 29, 2011, the Company disclosed that "based on [NASDAQ's]

6    review of public documents and information provided by the Company, Nasdaq [sic] determined

7    that the continued listing of the Company's securities on Nasdaq [sic] is no longer warranted."

8    Importantly, the Listing Qualifications Department expressly cited failures by each member of the

9    Board, including the Special Committee members and the two management directors, Chief

10   Executive Officer ("CEO") X. Chen and Chief Operating Officer ("COO") and acting Chief

11   Financial Officer ("CFO") Anhui Guo ("Guo"), which contributed to its decision. NASDAQ

12   specifically identified the obstructionist behavior of X. Chen and Guo, who have actively and

13   intentionally impeded the Special Committee's supposed investigation.

14        12.    As explained further below, that "investigation" was never intended to uncover or

15   explore any discrepancies or "unexplained" issues in connection with the Company's internal

16   financial controls. The members of the Special Committee were fully aware of the discrepancies

17   identified by KPMG well in advance of being informed by KPMG that they existed. Indeed, as

18   evidenced by the Board's review and approval of a debt offering in December 2010, each member

19   of the Board was aware of the Company's true financial condition, and each had knowledge of the

20   falsity of certain disclosures made by Company management concerning the same. Thus, as

21   recognized by both KPMG and NASDAQ, none of the directors are able or willing to conduct a

22   proper "investigation" into the accounting issues identified by KPMG. Further, despite the noted

23   obstructionist behaviors of X. Chen and Guo, the Special Committee members have not taken any

24   actions to curb or otherwise prohibit X. Chen's or Guo's interference with its "investigation."

25

26

27

28

1

**PARTIES**

2      13.      Plaintiff, a citizen of the State of New Mexico, is a shareholder of the Company,

3   was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a

4   shareholder of the Company continuously since that time.

5      14.      Nominal Defendant ShengdaTech is a Nevada corporation with its corporate

6   headquarters located at 35th Floor, World Plaza, 855 South Pudong Road, Pudong, Shanghai

7   200120.  According to its public filings, ShengdaTech is a leading manufacturer of NPCC and

8   NPCC products in China.  The Company produces NPCC and NPCC products for use in paint,

9   paper, plastic, and rubber industrial applications, primarily supplying customers in Shandong

10  Province and other areas in northern China.  Prior to April 20, 2011, ShengdaTech stock was

11  traded on the NASDAQ stock exchange under the ticker symbol "SDTH."

12     15.      Defendant X. Chen is ShengdaTech's CEO and President, as well as the Chairman

13  of the Board.  He has served in these roles since March 31, 2006.  In addition, as of September 17,

14  2010, X. Chen was the Company's largest stockholder, owning 22,902,912 shares, which was

15  42.3% of all shares issued and outstanding at that time.  As of September 17, 2010, X. Chen's

16  wife also owned 1,998,816 shares of Company stock, which accounted for an additional 3.7% of

17  all shares issued and outstanding at that time.  Upon information and belief, X. Chen is a citizen of

18  China.

19     16.      Defendant Guo is the Company's former acting CFO, COO, Vice President, and

20  Treasurer.  Guo served as the Company's COO from April 2009 until her resignation in April

21  2011.   In addition, Guo was appointed acting CFO on September 30, 2010 following the

22  resignation of defendant Andrew Weiwen Chen ("A. Chen").  Prior to becoming COO in April

23  2009, Guo served as the Company's CFO, Vice President, and Treasurer, taking those positions

24  on March 31, 2006.  Guo also has served as a director of the Company since February 23, 2007,

25  when Defendant X. Chen appointed Guo to the Board. Upon information and belief, Guo is a

26  citizen of China.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              -6-

17. Defendant A. Chen served as the Company's CFO from April 15, 2009 to September 30, 2010. A. Chen resigned purportedly for personal reasons on September 30, 2010, only months before the Company's issues with its financial records and reporting came to light. Upon information and belief, A. Chen is a citizen of China.

18. Defendant Zhang has served as a director of the Company since February 23, 2007, when Defendant X. Chen appointed Zhang to the Board. Zhang is Chairman of the Governance and Nominating Committee of the Board. He likewise has served on the Board's Audit Committee and Compensation Committee since February 23, 2007. Zhang is also a member of the Board's Special Committee, which was purportedly responsible for investigating the accounting issues identified by KPMG. Upon information and belief, Zhang is a citizen of China.

19. Defendant Mudd has served as a director of the Company since February 23, 2007, when Defendant X. Chen appointed Mudd to the Board. Mudd is Chairman of the Audit Committee of the Board. He likewise has served on the Board's Governance and Nominating Committee and Compensation Committee since February 23, 2007. Mudd is also a member of the Board's Special Committee. Upon information and belief, Mudd is a citizen of the State of Texas.

20. Defendant Saidman has served as a director of the Company since February 23, 2007, when Defendant X. Chen appointed Saidman to the Board. Saidman is Chairman of the Compensation Committee. He likewise has served on the Board's Governance and Nominating Committee and Audit Committee since February 23, 2007. Saidman is also a member of the Board's Special Committee. Upon information and belief, Saidman is a citizen of the State of Colorado.

21. Defendants X. Chen, Guo, A. Chen, Mudd, Saidman, and Zhang are referred to collectively herein as the "Individual Defendants."

22. Defendants Mudd, Saidman, and Zhang are sometimes referred to herein as the "Special Committee" and/or the "Special Committee Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

25.    To discharge their duties as officers and directors of the Company, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

> a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;
>
> b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, including acting only within the scope of its legal authority; and
>
> c.    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

26.    The Individual Defendants, and all employees of the Company, were required to comply with the Company's Code of Conduct and Ethics, which provides:

Each employee, officer and director of the Company shall:

• Act honestly and ethically in the performance of his or her duties at the Company.

* * *

• Cooperate fully with the people responsible for preparing reports and documents that the Company files with, or submits to, the U.S. Securities and Exchange Commission or that the Company makes available to the public to insure that those people are aware in a timely manner of all information that might have to be disclosed in those reports or documents or that might affect the way in which information is disclosed.

• Comply with all laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the conduct of the Company's business and the Company's financial reporting.

• Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing the employee's independent judgment to be subordinated.

* * *

• Promptly bring to the attention of the Chief Executive Officer or Chair of the Audit Committee of the Board of Directors any information of which the employee has knowledge concerning (a) significant deficiencies and material weaknesses in the design or operation of disclosure controls and internal controls over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting disclosures or internal controls over financial reporting.

27.     The Ethics Code further charges the Company's Board and executive officers with additional responsibilities:

The Board of Directors, Executive Officers and Financial and Accounting Officers and Managers hold an important role in corporate governance. The Board of Directors, Executive Officers and Financial and Accounting Officers and Managers will exhibit and promote the highest standards of honest and ethical conduct through the establishment and operation of policies and procedures that:

1. Encourage professional integrity in all aspects of the financial organization, by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal, or alienation from the financial organization or the enterprise itself.

2. Provide a mechanism for members of the finance organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

3. Make certain business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with U.S. Generally Accepted Accounting Principles (GAAP) and established company financial policy.

4. Deliver periodic financial communications and reports in a manner that facilitates a high degree of clarity of content and meaning so that readers and users can determine their significance and consequence.

28.     Defendants Mudd, Saidman, and Zhang, as members of the Board's Audit Committee, were further subject to the mandates of the Audit Committee Charter, which provides:

**1. PURPOSE**

The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by reviewing the financial information that will be provided to the stockholders and others; reviewing the systems of internal controls that management and the Board have established; appointing, retaining and overseeing the performance of independent accountants; and overseeing the Company's accounting and financial reporting processes and the audits of the Company's financial statements.

\* \* \*

**3. RESPONSIBILITIES AND DUTIES**

To fulfill its responsibilities and duties, the Committee shall:

. . .

2. Review the significant accounting principles, policies and practices followed by the Company in accounting for and reporting its financial results of operations in accordance with generally accepted accounting principles ("GAAP").

. . .

4. Review the Company's annual audited financial statements, related disclosures, including the MD&A portion of the Company's filings, and discuss with the independent accountants the matters required to be discussed by Auditing Standard No. 61, including (a) the quality as well as acceptability of the accounting principles applied in the financial statements, and (b) new or changed accounting policies; significant estimates, judgments, uncertainties or unusual transactions; and accounting policies relating to significant financial statement items.

5. Review any management letters or internal control reports prepared by the independent accountants or the Company's internal auditors and responses to prior management letters, and review with the independent accountants the Company's internal financial controls, including the budget, staffing and responsibilities of the Company's financial and accounting staff.

. . .

11. For each of the first three fiscal quarters and at year end, at a Committee meeting review with management the financial results, the proposed earnings press release and formal guidance that the Company may plan to offer, and review with the independent accountants the results of their review of the interim financial information and audit of the annual financial statements.

12. Review management's analysis of any significant accounting issues, changes, estimates, judgments or unusual items relating to the financial statements and the selection, application and effects of critical accounting policies applied by the Company (including an analysis of the effect of alternative GAAP methods) and review with the independent accountants the reports on such subjects delivered pursuant to Section 10A(k) of the Exchange Act and the rules and regulations promulgated thereunder by the SEC.

13. Following completion of the annual audit, review separately with the independent accountants, appropriate members of the Company's finance and accounting staff and management any significant difficulties encountered during the course of the audit.

***

### 4. COMMITTEE MEETINGS

The Committee will meet on a regular basis at least 4 times each year, and will hold special meetings as circumstances require. . . . The [Committee's] calendar shall include appropriate meetings to be held separately with representatives of the independent accountants, management and appropriate members the Company's finance and accounting staff, including a meeting to conduct the reviews required under Section 3.13 above. In addition, the Committee will meet at any time that the independent accountants believe communication to the Committee is required.

## FACTUAL ALLEGATIONS

29.     As of November 8, 2010, when ShengdaTech released its financial results for the third quarter of 2010, the Company appeared to be thriving. Indeed, when disclosing its financial results for that quarter, the Company touted its strong liquidity and tremendous year-over-year increases in operating income and net sales. For example, according to the Company's November 8, 2010 press release, the Company's net sales from continuing operations rose 35.6% year-over-year to $34.4 million. Likewise, the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA") rose 40.4% relative to the third quarter of 2009. The Company bragged of similar increases in operating income, which increased 40.6% year-over-year to $11.5 million. In light of its increased net income, the Company reported a 45.3% year-over-year growth in earnings per share ("EPS").

30.     The Company credited the increase in net sales to "higher sales volume as a result of the Company's expanded production capacity, improved capacity utilization to meet the growing market demand, as well as an increase in average selling price." The Company similarly attributed its increases in gross profits to an "increase in the average selling price of the

Company's NPCC products." Thus, the overall picture provided by the third quarter financials was that of a healthy and thriving company, expanding its production capacity to meet growing consumer demands for NPCC products. As defendant X. Chen commented:

> We believe we can continue to run our operations efficiently and reinvest our operating cash flow in our business. We are confident that our products, customer relationships, expanded international sales force, innovative new applications and aggressive capacity expansion plans will allow us to continue our penetration into new markets and capture greater market share of the rapidly growing NPCC market. When combining our notable achievements to date with the progressive strategic plans in place, we believe that the management team is well positioned to continue our record of highly favorable financial performance for years to come.

31.     With regard to the ShengdaTech's liquidity, the Company stated that it held "cash of $120.6 million, compared with $116.0 million at the end of December 2009." These cash reserves purportedly exceeded the Company's total liabilities as of September 30, 2010 and appeared to be reflective of the Company's reported increases in net cash flow due to its "effective collection of accounts receivable" and lower tax burden.

32.     Despite the astounding year-over-year growth in net sales, operating income, and cash flow reported by the Company, on December 9, 2010, the Company unexpectedly announced its intention to "offer an aggregate of $90.0 million of senior convertible notes due 2015 [ ] in a private offering." The following day, the Company increased the offering to "$130.0 million in aggregate principal amount of its 6.50% Senior Convertible Notes due 2015." The debt offering, which was approved by the Board, took place on December 14, 2010, raising net proceeds of $123.5 million for the Company.

33.     The Company purportedly used $67.2 million of those proceeds to repurchase existing Senior Convertible Notes at 6.0% due in 2018. Considering the Company's reported stellar financial performance throughout 2010 and its purportedly large cash reserves, shareholders began to question the need for, and propriety of, this debt offering, in which the Company issued new debt on less favorable terms than the existing notes it repurchased with the proceeds of the new debt offering.

34.     Indeed, shareholders did not respond well to the announcement of the debt offering. On December 9, 2010, the day the Company initially announced that it was undertaking

1    a debt offering, ShengdaTech's stock price dropped $0.70, or 12%, from its opening price of

2    $5.76. By December 14, 2010, the day the debt offering closed, the Company's shares sank

3    further to close at $4.69. This represented an 18.5% drop in stock price in less than one week of

4    trading.

5          35.    Responding to inquiries by concerned shareholders, defendant X. Chen issued a

6    "Q&A" for shareholders through a Form 8-K filing with the SEC on December 17, 2010, in which

7    he attempted to defend the Board's and management's decision to conduct the offering despite the

8    large cash reserves that appear on the Company's balance sheets. In that Q&A, X. Chen

9    explained that although the Company purported to hold approximately $121 million in cash, $98

10   million of that cash position was held in RMB (Chinese currency) in Chinese banks. X. Chen

11   went on to explain that "it is cost prohibitive for the Company to convert the RMB cash balance

12   into [U.S. dollars]." The concerns raised by KPMG only months later regarding the Company's

13   "bank accounts" and sales figures, however, cast serious doubt on the truth of this assertion and

14   call into question whether the Company had the cash reserves it purported to have at that time.

15         36.    For example, defendant X. Chen further explained that the full Board considered

16   alternatives to the debt offering, but chose to conduct the debt offering rather than an equity

17   offering or, more importantly, a loan collateralized with the Company's cash surplus:

18   > The Company, its Board and financial advisors considered a number of alternatives
19   > for raising capital, including securing loans using our RMB bank deposits as
     > collateral, an equity offering and a convertible debt offering. Given the near-term
20   > need for capital and prevailing market conditions, our financial advisors advised us
     > that an equity offering would be difficult to achieve and advised a convertible debt
21   > offering. The Company, its Board and its financial advisors evaluated these options
     > in detail before making a decision.

22         37.    While X. Chen provided a seemingly colorable explanation for why a debt offering

23   was preferred to an equity offering, he failed to explain how he and the other members of the

24   Board ruled-out "securing loans using our RMB bank deposits as collateral." His intentional

25   omission in this regard is understandable. The Individual Defendants could not use imaginary

26   funds to collateralize a loan and could not disclose that the purported cash surplus was either non-

27   existent or substantially smaller than reported.

28

38.     Further demonstrating the spurious nature of the proffered explanations for the debt offering is the fact that the proceeds from the offering in excess of the $67.2 million used to repurchase existing notes – repurchases which were required under the express terms of the existing notes before the 2010 debt offering could occur – were earmarked for "NPCC capacity expansion plans at [the Company's] Zibo and Anhui Yuanzhong facilities" and "a number of important R&D activities."  In other words, the Company intended to use the proceeds of the debt offering, net of any repurchases of pre-existing debentures, to expand its operations exclusively inside the People's Republic of China.  Thus, the Individual Defendants' representations that it was "cost prohibitive" to convert the Company's alleged cash surplus from RMB to U.S. dollars is a red herring, as there was no need to convert the proceeds to U.S. dollars.

39.     Indeed, the Company has never explained how expansion projects taking place exclusively in China could not occur through the use of RMB rather than U.S. dollars.  While the Individual Defendants represented that the Company "was obligated to expansion costs of approximately $60 million to the PRC government, which must be paid in USD by contract," it did not state any intention to use the proceeds from the 2010 debt offering for this purpose. Instead, the Company's Q&A obtusely explained that "[i]n addition to NPCC capacity expansion plans at our Zibo and Anhui Yuanzhong facilities mentioned, we plan to carry out a number of important R&D activities including the purchase of new state-of-the [sic] art equipment and further expansion of our R&D facilities."

40.     The falsity of the representations made concerning the Company's stellar financial performance in 2010 and liquidity was not brought to light until several months later.  During KPMG's audit of the Company's financial records for 2010, KPMG identified seven specific areas of accounting discrepancies and unexplained issues that would have the cumulative effect of overstating the financial health, success, and liquidity of the Company.

41.     As disclosed by the Company in its May 5, 2011 Form 8-K:

> [KPMG's] concerns included serious discrepancies and unexplained issues relating to, among others:  (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies

between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

42.    These discrepancies further called into question the truth of the Individual Defendants' representations concerning the December 2010 debt offering.  This includes not only the statements made to the shareholders in the Q&A document, but also the representations made to the initial purchasers of the notes in the Purchase Agreement and accompanying Disclosure Package and Offering Memorandum for the debt offering.  In addition to including or otherwise incorporating the Company's falsified financial statements in these documents, these documents also set out certain representations by the Company which could not have been true in light of KPMG's findings.

43.    For example, the Purchase Agreement expressly stated that the Company was not aware of:  "(i) any material weakness or significant deficiency in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or any material weaknesses in internal controls; (ii) any matter which could result in a restatement of the Company's financial statements for any annual or interim period during the current fiscal year or prior fiscal years; or (iii) any fraud that involves management or other employees of the Company who have a role in the Company's internal controls."  These statements are clearly inconsistent with KPMG's inability to verify the Company's publicly reported sales figures, bank account balances, and accounts receivables. Nevertheless, defendants X. Chen, Guo, Zhang, Mudd, and Saidman, in full knowledge of the true financial condition of the Company and the falsity of the Company's financial reports, knowingly permitted these misrepresentations to be made.

44.    Further adding to the list of ways in which the Individual Defendants breached their fiduciary duties to the Company, rather than working with KPMG to resolve the concerns it identified during the course of its audit, the Individual Defendants serving on the Board in 2011 either feigned cooperation or intentionally obstructed KPMG's efforts.  Indeed, as disclosed by the Company in its May 5, 2011 Form 8-K, "KPMG informed the board of directors of the Company that in KPMG's view the Company's senior management has not taken, and the board of directors

1  has not caused senior management to take, timely and appropriate remedial actions with respect to

2  [the accounting] discrepancies" KPMG identified.

3       45.    The Listing Qualifications Department for NASDAQ similarly identified failures

4  by each member of the Board to act in accordance with their duties during the Special

5  Committee's investigation. In a Form 8-K filed on April 29, 2011, the Company disclosed:

6        On April 29, 2011, ShengdaTech, Inc. (the "Company") issued a press release
      announcing that on April 20, 2011, the Company received a letter from the Listing

7        Qualifications Department of The NASDAQ Stock Market LLC ("Nasdaq") stating
      that based on the review of public documents and information provided by the

8        Company, Nasdaq determined that the continued listing of the Company's securities
      on Nasdaq is no longer warranted. The Nasdaq letter cited the following criteria as

9        the reasons for the determination:

10       (1) public interest concerns under Nasdaq Listing Rule 5101 raised by the serious
      accounting and operational issues uncovered by KPMG, the Company's independent

11       registered public accounting firm; the deliberate and ongoing efforts of the
      Company's Chief Executive Officer and Acting Chief Financial Officer, Mr.

12       Xiangzhi Chen and Ms. Anhui Guo, respectively, to obstruct an internal
      investigation into these matters; the Company's failure to promptly disclose material

13       information related to that investigation; and the Company's violation of the rules
      setting forth the responsibilities and authority of the Audit Committee;

14
15       (2) the Company's failure to make prompt public disclosure of material
      developments relating to the investigation, as required by Nasdaq Listing Rule

16       5250(b)(1) and IM−5250−1;

17       (3) the Company's violations of Nasdaq Listing Rule 5605(c)(3) and IM−5605 as
      well as the statutory responsibilities and authority of the Audit Committee set forth

18       in Section 10A(m)(2) of the Securities and Exchange Act of 1934 caused by the
      obstructive conduct of the Company's executive management, including failure to

19       pay for advisors engaged to assist with the internal investigation by the special
      committee of the Board of Directors of the Company; and

20       (4) the Company's failures to timely file with the Securities and Exchange
      Commission its Annual Report on Form 10−K for the period ended December 31,

21       2010, as required by Nasdaq Listing Rule 5250(c)(1), and to present a definitive plan
      that demonstrates its ability to regain compliance within the time period permitted

22       under Nasdaq's Listing Rules.

23      46.    In the same Form 8-K filing, the Company disclosed the resignation of defendant

24 Guo.

25      47.    Thus, both NASDAQ and KPMG identified (1) intentional obstructionist conduct

26 by defendants X. Chen and Guo to impede the Special Committee's supposed "investigation," and

27 (2) a complete and utter failure on the part of the Special Committee members to take appropriate

28

action during the course of its investigation.  These independent fiduciary breaches compound the Individual Defendants' initial knowing failure to implement or to otherwise maintain and oversee the Company's internal controls over financial reporting and X. Chen, Guo, Zhang, Mudd, and Saidman's approval of the questionable 2010 debt offering.

48.     Further demonstrating that each Special Committee member was complicit in defendants X. Chen's and Guo's efforts to keep the true financial status and liquidity of the Company concealed is the fact that the Special Committee has not taken any action to hold defendants X. Chen and Guo or others accountable for deliberately impeding the Special Committee's supposed investigation, and further has not taken any action to remove or suspend X. Chen from his position as CEO of the Company.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

49.     The Individual Defendants initially breached their fiduciary duties of loyalty and good faith by knowingly failing to implement or otherwise maintain and oversee internal controls over the Company's financial reporting, such that the Company's management was allowed to overstate the Company's financial health and cash reserves.  In addition, the Individual Defendants knowingly caused or otherwise knowingly allowed the Company to misstate its financial results throughout 2010.

50.     The Board's conduct in connection with the December 2010 debt offering – which replaced existing notes with notes on less favorable terms to the Company – demonstrate that each member of the Board who approved the debt offering was aware that the Company did not have the cash reserves it purported to have and was not performing as the Individual Defendants led the shareholders and noteholders to believe.  Thus, in violation of their fiduciary duties, the Individual Defendants knowingly caused or allowed the Company to make further misrepresentations in connection with the debt offering.

51.     Additionally, when KPMG exposed the "serious discrepancies" in the Company's financial records, defendants X. Chen and Guo intentionally impeded any inquiries into those discrepancies, in violation of their fiduciary duties.  The Special Committee Defendants, in turn,

feigned cooperation with both KPMG and NASDAQ, in contradiction of their fiduciary obligations as directors and, more specifically, as members of the Audit Committee. The members of the Special Committee, who have been fully aware of the falsity of the Company's financial records since *at least* their decision to approve the December 2010 debt offering, had no interest in truly investigating any of the accounting discrepancies and other issues that KPMG identified, as they were also complicit in the wrongdoing.

52.     As a result of the Individual Defendants' misconduct, the Company has sustained damages, including, but not limited to, costs and expenses incurred in connection with the NASDAQ listing proceedings and the Special Committee's purported investigation.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

53.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

54.     Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

55.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

56.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

57.     Further, where, as here, a shareholder sues a board of directors over an act that was not the product of a valid exercise of business judgment, such as the Board's waste of corporate assets in connection with the 2010 debt offering, demand is excused, regardless of whether a majority of the board is disinterested and independent.

58.     As of the date hereof, ShengdaTech's Board consists of four directors, defendants X. Chen, Zhang, Mudd, and Saidman. The following chart summarizes their tenures on the Board and their Board committee memberships.

| Director | Year Appointed to Board | Audit Committee Member | Compensation Committee Member | Governance and Nominating Committee Member | Special Committee Member |
|---|---|---|---|---|---|
| X. Chen* | 2006 | | | | |
| Zhang | 2007 | X | X | X (Chairman) | X |
| Mudd | 2007 | X (Chairman) | X | X | X |
| Saidman | 2007 | X | X (Chairman) | X | X |

*Chairman of Board of Directors

59.     None of these directors can consider a demand to institute litigation because each is substantially likely to be held liable for the fiduciary breaches and corporate waste described above.

60.     X. Chen, by virtue of his roles as founder and CEO, was knowledgeable of the Company's true financial condition and lack of internal controls over financial reporting. X. Chen likewise personally made many of the misrepresentations concerning the Company's overstated financial condition in 2010. Defendant X. Chen also wasted corporate assets by approving the 2010 debt offering, a transaction that was so one-sided that no business person of ordinary, sound judgment could conclude that the Company received adequate consideration for it. Indeed, if the Company had the cash reserves that it represented it had in 2010, then the debt offering would not have provided any benefit to the Company at all, since it replaced existing notes with new notes on less favorable terms. Further, fully aware of the Company's true financial condition, X. Chen has actively obstructed the Special Committee's supposed "investigation" into the accounting discrepancies identified by KPMG. Indeed, NASDAQ explicitly identified X. Chen's obstructionist conduct as a basis for its decision to de-list the Company's stock. Similarly, KPMG cited X. Chen's obstructionist behavior as a reason for its decision to resign as the Company's

auditor. Thus, X. Chen has demonstrated that he is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, as he is substantially likely to be held liable for breaching his fiduciary duties and wasting corporate assets by and through the acts described herein.

61.     Defendant Zhang is likewise incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.   Zhang has been a member of the Board's Audit Committee since February 2007.   As such, he had the duty and obligation to oversee the Company's financial reporting process and to review and approve management's public disclosures concerning the Company.   Zhang utterly failed to adhere to these duties, knowingly allowing the Company's management to wholly misrepresent the financial status of the Company to the investing public and failing to implement appropriate controls over financial reporting that would prevent such false disclosures.   Likewise, Zhang approved the 2010 debt offering, which would not have been necessary if the Company's financial picture was as robust as the Company's public disclosures suggested.   Thus, Zhang had knowledge of the Company's true financial condition.   Zhang also wasted corporate assets by approving the 2010 debt offering, a transaction that was so one-sided that no business person of ordinary, sound judgment could conclude that the Company received adequate consideration for it.   In an effort to keep his earlier fiduciary breaches concealed, Zhang then failed to conduct a proper investigation into the "serious" accounting discrepancies identified by KPMG.   Indeed, KPMG identified Zhang's failure, as a member of the Board, to cause Company management to take actions necessary to remedy the serious accounting issues KPMG identified.   Similarly, NASDAQ cited Zhang's failure, as a member of the Audit Committee, to adhere to the responsibilities of such a committee and for failing to timely disclose information related to the Special Committee's investigation as reasons for its decision to de-list the Company's stock. Thus, Zhang has demonstrated that he is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, as he is substantially

1    likely to be held liable for breaching his fiduciary duties and wasting corporate assets by and

2    through the acts described herein.

3        62.      Defendant Mudd is similarly incapable of independently and disinterestedly

4    considering a demand to commence and vigorously prosecute this action. Mudd has been the

5    chairman of the Board's Audit Committee since February 2007. As such, he had the duty and

6    obligation to oversee the Company's financial reporting process and to review and approve

7    management's public disclosures concerning the Company. Mudd utterly failed to adhere to these

8    duties, knowingly allowing the Company's management to wholly misrepresent the financial

9    status of the Company to the investing public and failing to implement appropriate controls over

10    financial reporting that would prevent such false disclosures. Likewise, Mudd approved the 2010

11    debt offering, which would not have been necessary if the Company's financial picture was as

12    robust as the Company's public disclosures suggested. Thus, Mudd had knowledge of the

13    Company's true financial condition. Mudd also wasted corporate assets by approving the 2010

14    debt offering, a transaction that was so one-sided that no business person of ordinary, sound

15    judgment could conclude that the Company received adequate consideration for it. In an effort to

16    keep his earlier fiduciary breaches concealed, Mudd then failed to conduct a proper investigation

17    into the "serious" accounting discrepancies identified by KPMG. Indeed, KPMG identified

18    Mudd's failure, as a member of the Board, to cause Company management to take actions

19    necessary to remedy the serious accounting issues KPMG identified. Similarly, NASDAQ cited

20    Mudd's failure, as a member of the Audit Committee, to adhere to the responsibilities of such a

21    committee and for failing to timely disclose information related to the Special Committee's

22    investigation as reasons for its decision to de-list the Company's stock. Mr. Mudd's myriad

23    fiduciary breaches are especially shocking, considering the facts that Mr. Mudd is a certified

24    public accountant and also serves as a Statutory Director of the National Association of Corporate

25    Directors – North Texas Chapter and as a Director in Residence for the Institute for Excellence in

26    Corporate Governance at the University of Texas at Dallas School of Management. Nevertheless,

27    Mudd has demonstrated that he is incapable of independently and disinterestedly considering a

28

1  demand to commence and vigorously prosecute this action, as he is substantially likely to be held

2  liable for breaching his fiduciary duties and wasting corporate assets by and through the acts

3  described herein.

4      63.    Defendant Saidman is also incapable of independently and disinterestedly

5  considering a demand to commence and vigorously prosecute this action. Saidman has been a

6  member of the Board's Audit Committee since February 2007. As such, he had the duty and

7  obligation to oversee the Company's financial reporting process and to review and approve

8  management's public disclosures concerning the Company. Saidman utterly failed to adhere to

9  these duties, knowingly allowing the Company's management to wholly misrepresent the

10  financial status of the Company to the investing public and failing to implement appropriate

11  controls over financial reporting that would prevent such false disclosures. Likewise, Saidman

12  approved the 2010 debt offering, which would not have been necessary if the Company's financial

13  picture was as robust as the Company's public disclosures suggested. Thus, Saidman had

14  knowledge of the Company's true financial condition. Saidman also wasted corporate assets by

15  approving the 2010 debt offering, a transaction that was so one-sided that no business person of

16  ordinary, sound judgment could conclude that the Company received adequate consideration for

17  it. In an effort to keep his earlier fiduciary breaches concealed, Saidman then failed to conduct a

18  proper investigation into the "serious" accounting discrepancies identified by KPMG. Indeed,

19  KPMG identified Saidman's failure, as a member of the Board, to cause Company management to

20  take actions necessary to remedy the serious accounting issues KPMG identified. Similarly,

21  NASDAQ cited Saidman's failure, as a member of the Audit Committee, to adhere to the

22  responsibilities of such a committee and for failing to timely disclose information related to the

23  Special Committee's investigation as reasons for its decision to de-list the Company's stock.

24  Thus, Saidman has demonstrated that he is incapable of independently and disinterestedly

25  considering a demand to commence and vigorously prosecute this action, as he is substantially

26  likely to be held liable for breaching his fiduciary duties and wasting corporate assets by and

27  through the acts described herein.

28

64. Further demonstrating Zhang, Mudd, and Saidman's inability to independently and disinterestedly consider a demand to institute litigation is the fact that they have not taken any action against Defendants X. Chen or Guo, who have purportedly interfered with the Special Committee defendants' "investigation." Indeed, as members of the Board and the Board's various committees, Zhang, Mudd and Saidman have the authority under Nevada law and the Company's Articles of Incorporation and other corporate governance documents to remove, suspend, or otherwise take action against X. Chen and Guo to stop their interference with the Special Committee's investigation. Yet Zhang, Mudd, and Saidman have not done so to date, and they have deliberately allowed defendant X. Chen's wrongful conduct to continue unabated to the detriment of the Company.

## COUNT I

**Against the Individual Defendants for Breach of Fiduciary Duty for Knowingly Failing to Implement and/or Otherwise Maintain Adequate Internal Controls over Financial Reporting and for Knowingly Allowing the Company to Make False and Misleading Statements**

65. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

66. As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

67. Notwithstanding their obligations, the Individual Defendants knowingly failed to implement or otherwise maintain and oversee adequate internal controls over the Company's financial reporting, and further knowingly allowed the Company to misrepresent its financial condition to the investing public and the initial purchasers of the December 2010 notes.

68. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages as alleged herein.

## COUNT II

### Against Defendants X. Chen, Guo, Zhang, Mudd, and Saidman for Waste of Corporate Assets

69.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     Defendants X. Chen, Guo, Zhang, Mudd, and Saidman caused the Company to expend Company assets in furtherance of the 2010 debt offering, which would not have been necessary if the Company's representations concerning its financial condition were true.

71.     As a direct and proximate result of this waste of corporate assets, the Company has sustained and will continue to sustain substantial damages caused by the less favorable terms of the debt offering (when compared to the pre-existing notes issued in 2008) and the additional costs associated with conducting the offering.

## COUNT III

### Against Defendants X. Chen and Guo for Breach of Fiduciary Duty for Intentionally Interfering with the Special Committee's Investigation

72.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.     As alleged in detail herein, X. Chen and Guo had fiduciary duties to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

74.     Defendants X. Chen and Guo breached their fiduciary duties by interfering with the Special Committee's investigation into the accounting issues identified by KPMG.  Both KPMG and NASDAQ cited X. Chen's and Guo's obstructionist conduct as reasons for their respective decisions to resign as the Company's auditor and to de-list the Company's stock.

75.     As a direct and proximate result of X. Chen's and Guo's breaches of fiduciary duties, the Company has sustained damages as alleged herein.

## COUNT IV

### Against Defendants Zhang, Mudd, and Saidman for Breach of Fiduciary Duty for Deliberately Failing to Conduct a Proper Investigation of the Accounting Issues Identified by KPMG

76.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.     As alleged in detail herein, Zhang, Mudd, and Saidman had fiduciary duties to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

78.     Defendants Zhang, Mudd, and Saidman breached their fiduciary duties by deliberately failing to conduct an appropriate investigation into the accounting issues identified by KPMG and by failing to take appropriate action to curb or otherwise neutralize X. Chen and Guo's obstructionist conduct during the course of the Special Committee's investigation. KPMG specifically identified the Board's failures to cause Company management to take appropriate remedial action as a reason for its decision to resign as the Company's auditor.   Similarly, NASDAQ identified the failure of Zhang, Mudd, and Saidman to adhere to their responsibilities as members of the Audit Committee and to timely disclose information discovered through the Special Committee's investigation as reasons for NASDAQ's decision to de-list the Company's stock.

79.     As a direct and proximate result of Zhang, Mudd, and Saidman's breaches of fiduciary duties, the Company has sustained damages as alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and waste of corporate assets;

B.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses;

C.    Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties; and

D.    Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: August 2, 2011                              Respectfully submitted

                                                   By: _____

                                                   Martin A. Muckleroy
                                                   Nevada Bar ID No. 9634
                                                   **COOKSEY, TOOLEN GAGE,**
                                                   **DUFFY & WOOG, P.C.**
                                                   3930 Howard Hughes Parkway, Suite 200
                                                   Las Vegas, Nevada 89169
                                                   Telephone: (702) 949-3100
                                                   Facsimile:  (702) 944-3104
                                                   mmuckleroy@cookseylaw.com

                                                   Eric L. Zagar
                                                   Robin Winchester
                                                   Justin O. Reliford
                                                   **KESSLER TOPAZ**
                                                   **MELTZER & CHECK, LLP**
                                                   280 King of Prussia Road
                                                   Radnor, PA 19087
                                                   Telephone: (610) 667-7706
                                                   Facsimile:  (267) 948-2512
                                                   ezagar@ktmc.com
                                                   rwinchester@ktmc.com
                                                   jreliford@ktmc.com

                                                   (Attorneys Zagar, Winchester, and Reliford
                                                   will comply with LR IA 10-2 within 45 days of
                                                   the filing of this Complaint.)

                                                   ***Counsel for Plaintiff***

## VERIFICATION

I, Robert Johnson, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: __7-18-2011__

_Robert Johnson_
Robert Johnson